**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| PETER VOTTO,<br><br>     Plaintiff,<br><br>vs.<br><br>JOHN WALSH JR., HUGH GALLAGHER, MARVIN SCHLANGER, THOMAS DONOVAN, K. RICHARD TURNER, ANNE POL, WILLIAM MARRAZZO, BRIAN FORD, PEDRO RAMOS, JOHN HARTMANN, FRANK HERNANCE, ROGER PERREAULT, AMERIGAS PARTNERS, L.P., UGI CORPORATION, AMERIGAS, INC., AMERIGAS PROPANE, INC., AMERIGAS PROPANE HOLDINGS, INC., and AMERIGAS PROPANE HOLDINGS, LLC,<br><br>     Defendants. | Civil Action No: |

## COMPLAINT

Plaintiff Peter Votto ("Plaintiff"), by his undersigned attorneys, for his complaint against Defendants (defined below), alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1. This action is brought by Plaintiff, a holder of AmeriGas Partners L.P. ("AmeriGas" or the "Partnership") units (more fully described herein) against AmeriGas, its General Partner, and the members of the General Partner's board of directors (referred to as the "Board" or the "Individual Defendants," and, together with AmeriGas, the "Defendants") for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§

78n(a), 78t(a) respectively, and United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9, in connection with the acquisition of AmeriGas by UGI Corporation ("UGI" or "Parent").

2.      AmeriGas is a publicly traded limited partnership.  It is a holding company and conducts its business principally through its subsidiary, AmeriGas Propane, L.P. ("AmeriGas OLP"). AmeriGas Propane, Inc. is AmeriGas' general partner (the "General Partner") and is responsible for managing its operations.  The General Partner is a wholly owned subsidiary of UGI.

3.      On April 1, 2019, AmeriGas, UGI Corporation ("UGI" or "Parent"), AmeriGas Propane Holdings, Inc. ("Holdings"), AmeriGas Propane Holdings, LLC, ("Merger Sub"), and AmeriGas Propane, Inc. (the "General Partner") entered into an Agreement and Plan of Merger (the "Merger Agreement").

4.      Pursuant to the Merger Agreement the Merger Sub will merge with and into AmeriGas, with AmeriGas surviving the merger and becoming an indirect wholly owned subsidiary of Parent (the "Proposed Transaction").

5.      Also, on April 1, 2019 and concurrent with the Merger Agreement, AmeriGas and the General Partner entered into a Support Agreement.  Pursuant to the Support Agreement, the General Partner agreed to vote all covered units (*i.e.*, the Existing Units of which the General Partner is the Record Holder or beneficial owner) in favor of the Proposed Transaction.

6.      On May 6, 2019, in order to convince AmeriGas' public unitholders to vote in favor of the Proposed Transaction, Parent filed a materially incomplete and misleading Form S-4 Registration Statement (the "Proxy") with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act.

7.      The Proxy contains materially incomplete and misleading information concerning:

2

(i) the valuation analyses prepared by the Partnership's financial advisor, Tudor, Pickering, Holt & Co ("TPH"), in support of their fairness opinion and (ii) the potential conflicts of interest faced by the Board during the sales process leading up to the Proposed Transaction.

8.      Additionally, although the Proxy does not yet set the date for the special meeting of AmeriGas' unitholders to vote on the Proposed Transaction (the "Unitholder Vote"), the parties' joint press release does state their intention to conclude this merger during the fourth quarter of 2019.  It is therefore imperative that the material information that has been omitted from the Proxy is disclosed prior to the Unitholder Vote so AmeriGas unitholders can properly exercise their suffrage rights.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

10.      Personal jurisdiction exists over each Defendant either because each Defendant conducts business in or maintains operations in this District or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under traditional notions of fair play and substantial justice.

11.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because, among other things: (i) the conduct at issue had an effect in this District; (ii) each of the Individual Defendants (defined below) either resides in this District or has extensive contacts within this District; (iii) a substantial portion of the transactions and wrongs complained of herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in

numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

12.    ***Plaintiff Peter Votto*** ("Plaintiff") is, and at all relevant times, has been an AmeriGas unitholder.

**Defendants**

13.    ***Defendant AmeriGas Partners, L.P.*** ("AmeriGas" or the "Partnership") is a Delaware limited partnership with its principal executive offices located at 460 North Gulph Road, King of Prussia, PA 19406.  AmeriGas is a retail propane distributor.  AmeriGas common units are traded under the ticker symbol "APU".

14.    ***Defendant AmeriGas Propane, Inc.*** (the "General Partner") is a Pennsylvania corporation and the general partner of the Partnership.

15.    ***Defendant John Walsh*** ("Walsh") is, and has been at all relevant times, a director of the General Partner, and currently serves as its Executive Chairman.  He also serves as a Director and President (since 2005) and Chief Executive Officer (since 2013) of UGI.  Mr. Walsh serves on the Corporate Governance Committee of the General Partner.

16.    ***Defendant Hugh Gallagher*** ("Gallagher") is, and has been at all relevant times, a director of the General Partner, and also serves as its president and Chief Executive Officer ("CEO").  Gallagher began his career at UGI in 1990, serving in various financial and accounting roles.  He served as Director of Treasury Services of UGI from 2007 until 2009, Director of Treasury Services and Investor Relations of UGI from 2009 until 2011, and Treasurer of UGI from 2011 until 2014.

17.    ***Defendant Marvin Schlanger*** ("Schlanger") is, and has been at all relevant times, a director of the General Partner and currently serves as its Presiding Director.  Mr. Schlanger is

currently Chairman of the Board (since January 2016) of UGI.  Mr. Schlanger serves on the Compensation/Pension Committee, Executive Committee and Corporate Governance Committee of the General Partner.

18.     **Defendant K. Richard Turner** ("Turner") is, and has been at all relevant times, a director of the General Partner.  Mr. Turner serves on the Audit Committee of the General Partner.

19.     **Defendant Anne Pol** ("Pol") is, and has been at all relevant times, a director of the General Partner.  Mrs. Pol also serves as a Director of UGI Corporation, and UGI Utilities, Inc., an affiliate of the General Partner. Mrs. Pol serves on the Compensation/Pension Committee of the General Partner.

20.     **Defendant William Marrazzo** ("Marrazzo") is, and has been at all relevant times, a director of the General Partner.  Mr. Marrazzo serves on the Audit Committee and Compensation/Pension Committee of the General Partner.

21.     **Defendant Brian Ford** ("Ford") is, and has been at all relevant times, a director of the General Partner.  Mr. Ford serves on the Audit Committee and Corporate Governance Committee of the General Partner.

22.     **Defendant Pedro Ramos** ("Ramos") is, and has been at all relevant times, a director of the General Partner.  Mr. Ramos serves on the Corporate Governance Committee of the General Partner.

23.     **Defendant John Hartmann** ("Hartmann") is, and has been at all relevant times, a director of the General Partner.  Mr. Hartmann serves on the Audit Committee of the General Partner.

24.     **Defendant Frank Hermance** ("Hermance") is, and has been at all relevant times, a director of the General Partner.  Mr. Hermance also serves as a Director of UGI and UGI Utilities, Inc., an affiliate of the General Partner.

25.     ***Defendant Roger Perreault*** ("Perreaultr") is, and has been at all relevant times, a director of the General Partner.  Mr. Perreault s Executive Vice President, Global LPG of UGI and President of UGI International, LLC.

26.     The parties in paragraphs 15 through 25 are collectively referred to herein as the "Board" or the "Individual Defendants."

27.     ***Defendant UGI Corporation*** ("UGI" or "Parent") is a Pennsylvania corporation with its principal executive offices located at 460 North Gulph Road, King of Prussia, PA 19406, and is a party to the Merger Agreement.

28.     ***Defendant AmeriGas, Inc.*** ("AGI") is a wholly owned subsidiary of UGI and is the sole shareholder of the General Partner and as such, elects and controls the composition of the General Partner Board of Directors.

29.     ***Defendant AmeriGas Propane Holdings, Inc.,*** ("Holdings") is a Delaware corporation and a party to the Merger Agreement.

30.     ***Defendant AmeriGas Propane Holdings, LLC,*** ("Merger Sub") is a Delaware limited liability company and a party to the Merger Agreement.

31.     Collectively, all the defendants named herein are referred to as "Defendants."

## SUBSTANTIVE ALLEGATIONS

**The Proposed Transaction**

32.     On April 2, 2019, AmeriGas and UGI issued a joint press release announcing the Proposed Transaction. The press release stated, in relevant part:

**UGI TO ACQUIRE 100% OF THE PUBLICLY HELD UNITS OF
AMERIGAS PARTNERS, L.P.**

**Proposed acquisition of third-party common units follows comprehensive
strategic review of AmeriGas**

**Transaction beneficial to both companies**

**Unitholders of AmeriGas to receive cash and stock consideration representing a premium of 13.5% to AmeriGas' current trading price**

**UGI announces cumulative 25% dividend increase**

**UGI and AmeriGas update fiscal 2019 guidance**

**VALLEY FORGE, Pa., April 2, 2019** – UGI Corporation (NYSE: UGI) and AmeriGas Partners, L.P. (NYSE: APU; "AmeriGas") announced today that they have entered into a merger agreement under which UGI will fully consolidate its ownership of AmeriGas, the nation's largest retail propane marketer, by acquiring the 69.2 million publicly held common units it does not already own. Under the terms of the agreement, AmeriGas unitholders will receive 0.50 shares of UGI common stock plus $7.63 in cash consideration for each common unit of AmeriGas, representing a premium of 21.9% to AmeriGas' 30-day volume weighted average price and a 13.5% premium to the April 1, 2019 closing price of $31.13. AmeriGas unitholders will continue to receive a $0.95 per unit distribution for each quarter completed prior to the closing of the merger.

As part of the transaction, AmeriGas will no longer be a Master Limited Partnership ("MLP") and will instead become a wholly owned subsidiary of UGI. UGI currently holds an approximate 26% ownership interest in AmeriGas. AmeriGas Propane, Inc., a wholly owned UGI subsidiary, has served as AmeriGas' sole general partner since 1995 (the "General Partner").

The General Partner's Audit Committee comprised entirely of independent directors, after consultation with its independent legal and financial advisors, unanimously approved the merger agreement and determined it to be fair and reasonable to, and in the best interests of, AmeriGas and the unitholders unaffiliated with UGI. Subsequently, the transaction was approved by the Boards of both UGI and the General Partner.

"Our two companies have a long and successful history of working together, spanning 60 years," said John L. Walsh, President and Chief Executive Officer of UGI. "A consolidation of AmeriGas' ownership maximizes value for both companies and our respective stakeholders, as we will be better positioned to invest and grow. In particular, we welcome AmeriGas' current unitholders and look forward to being exceptional stewards of their capital."

The closing of the merger is subject to satisfaction of customary conditions. Under the partnership agreement, the merger is required to be approved by a majority of the outstanding AmeriGas common units. Affiliates of UGI own approximately 26% of the outstanding common units and have entered into a support agreement with AmeriGas whereby they have agreed to vote their common units in favor of the transaction.

**Compelling Financial and Strategic Benefits**

The transaction offers compelling financial and strategic benefits for both UGI and AmeriGas in the near and long term.

For UGI, the transaction is expected to:

- Increase UGI's cash flow per share by over 15% for fiscal 2020 on a fully consolidated basis.

- Provide over $200 million in additional annual cash flow, increasing its capability to make diversified investments across all business segments to further the company's growth strategy.

- Support the increase of UGI's annualized dividend to its shareholders, by $0.16 for the July dividend and another $0.10 following the transaction's close.

- Be accretive to Adjusted EPS beginning in fiscal 2020.

For AmeriGas and its current investors, the transaction is expected to:

- Provide unitholders an immediate 13.5% premium to the value of their units.

- Improve AmeriGas' cost of capital through the elimination of incentive distribution rights payable to the General Partner and support the long-term strength and stability of AmeriGas.

- Enable unitholders to share in the value of UGI, which has a diversified asset portfolio and a history of meeting long-term commitments to shareholders including 6% - 10% annual earnings growth and 4% annual dividend growth.

- Support the paydown of AmeriGas' short-term debt as a means of reducing leverage resulting in an enhanced credit profile.

- Eliminate administrative complexities and costs inherent to the MLP structure and resolve distribution coverage challenges.

"After conducting a comprehensive review of strategic alternatives, both the AmeriGas and UGI Boards determined that a merger of AmeriGas was the most compelling next step in our development. The transaction with UGI supports a strong and stable AmeriGas and empowers a focus on growth opportunities," said Hugh J. Gallagher, President and Chief Executive Officer of AmeriGas.

Roger Perreault, Executive Vice President, Global LPG, added, "This transaction

8

provides an opportunity to further align AmeriGas and UGI International's LPG distribution operations to drive efficiencies, support strategic initiatives, and accelerate growth. Additionally, AmeriGas unitholders will share in the value of a company with an outstanding track record of enhancing shareholder value."

John L. Walsh concluded, "We are pleased to increase our ownership of AmeriGas. This merger offers a compelling premium for AmeriGas unitholders and creates a platform for future cash flow and earnings growth for UGI. Our dividend increases represent our confidence in that future outlook."

**Guidance Update**

As the heating season concludes, UGI is updating its fiscal 2019 adjusted EPS guidance to $2.40 - $2.60 from $2.75 - $2.95, due to significantly warmer-than-normal winter weather in its European markets, as well as the impact of limited weather volatility during the fiscal 2019 heating season on its capacity management business. This updated guidance excludes the impact of the proposed merger described above.

AmeriGas expects to be at the low end of its fiscal 2019 Adjusted EBITDA guidance range of $610mm - $650mm due in large part to unfavorable weather patterns in the Southern U.S. during January and February.

**Dividend Increase**

UGI plans to increase its second fiscal quarter dividend by 15% (an increase from $0.26 to $0.30) and an additional 10% (an increase from $0.30 to $0.325) following the closing of the transaction.

**Financing**

UGI, which does not currently have debt at the corporate level, plans to finance the cash portion of the transaction by entering into a bank term loan of approximately $500 million. The merger is not, however, subject to any financing condition.

**Closing Details**

This transaction is subject to the approval of AmeriGas' unitholders, as well as the satisfaction of customary closing conditions. The transaction is expected to close in the fourth quarter of fiscal 2019.

**Advisors**

J.P. Morgan Securities LLC is serving as UGI's financial advisor and Latham & Watkins LLP is serving as legal counsel.

Tudor, Pickering, Holt & Co. is serving as financial advisor to AmeriGas' Audit

Committee. Potter Anderson & Corroon LLP is serving as legal counsel to AmeriGas' Audit Committee and Baker Botts L.L.P. is serving as legal counsel to AmeriGas.

In connection with the transaction, the financial advisors provided fairness opinions to both UGI's Board and AmeriGas' Audit Committee. The fairness opinions referred to herein are, in each case, subject to certain assumptions made, matters considered, procedures followed, and other qualifications and limitations described in such opinions.

\* \* \*

## About UGI Corporation

UGI Corporation is a distributor and marketer of energy products and services. Through subsidiaries, UGI operates natural gas and electric utilities in Pennsylvania, distributes propane both domestically and internationally, manages midstream energy and electric generation assets in Pennsylvania, and engages in energy marketing in ten states, the District of Columbia and internationally in France, Belgium, the Netherlands and the UK. UGI, through subsidiaries, is the sole general partner and owns approximately 26% of AmeriGas, the nation's largest retail propane distributor.

## About AmeriGas Partners, L.P.

AmeriGas Partners, L.P. is the nation's largest retail propane marketer, serving over 1.7 million customers in all 50 states from approximately 1,900 distribution locations. UGI, through subsidiaries, is currently the sole general partner and owns approximately 26% of AmeriGas, with the public owning the remaining 74%. Comprehensive information about AmeriGas is available on the Internet at http://www.amerigas.com.

\* \* \*

## A Note on Guidance

## UGI

Because UGI is unable to predict certain potentially material items affecting diluted earnings per share on a GAAP basis, principally mark-to-market gains and losses on commodity and certain foreign currency derivative instruments and impacts from tax reform in the U.S. and France, UGI cannot reconcile 2019 adjusted earnings per share guidance, a non-GAAP measure, to diluted earnings per share, the most directly comparable GAAP measure, in reliance on the "unreasonable efforts" exception set forth in the rules of the U.S. Securities and Exchange Commission ("SEC").

## AmeriGas

Because AmeriGas is unable to predict certain potentially material items affecting net income on a GAAP basis, principally mark-to-market gains and losses on

commodity derivative instruments, we cannot reconcile 2018 Adjusted EBITDA, a non-GAAP measure, to net income attributable to AmeriGas Partners, L.P., the most directly comparable GAAP measure, in reliance on the "unreasonable efforts" exception set forth in SEC rules. Adjustments that management can reasonably estimate are provided below.

The following table includes a quantification of interest expense, income tax expense, depreciation and amortization included in the calculation of forecasted Adjusted EBITDA guidance range for the fiscal year ending September 30, 2019:

|  | Forecast Fiscal Year Ending September 30, 2019 | |
| --- | --- | --- |
|  | (Low End) | (High End) |
| Adjusted EBITDA (estimate) | $ 610,000 | $ 650,000 |
| Interest expense (estimate) | 166,000 | 162,000 |
| Income tax expense (estimate) | 3,000 | 3,500 |
| Depreciation (estimate) | 142,000 | 149,000 |
| Amortization (estimate) | 41,000 | 40,000 |

## Forward-Looking Statements

All statements in this press release (and oral statements made regarding the subjects of this communication) other than historical facts are forward-looking statements. The safe harbor provisions under Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934 do not apply to forward-looking statements made or referred to in this release. These forward-looking statements rely on a number of assumptions concerning future events and are subject to a number of uncertainties and factors, many of which are outside the control of UGI and AmeriGas, which could cause actual results to differ materially from such statements. Forward-looking information includes, but is not limited to: statements regarding the expected benefits of the proposed transaction to UGI and its shareholders and to AmeriGas and its unitholders; the anticipated completion of the proposed transaction and the timing thereof; the expected future growth, dividends and distributions of the combined company; and plans and objectives of management for future operations. While UGI believes that the assumptions concerning future events are reasonable, it cautions that there are inherent difficulties in predicting certain important factors that could impact the future performance or results of its business. Among the factors that could cause results to differ materially from those indicated by such forward-looking statements are: the failure to realize the anticipated costs savings, synergies and other benefits of the transaction; the possible diversion of management time on transaction-related issues; the risk that the requisite approvals to complete the transaction are not obtained; local, regional and national economic conditions and the impact they may have on UGI, AmeriGas and their customers; changes in tax laws that impact MLPs and the continued analysis of recent tax legislation; conditions in the energy industry, including cost volatility and availability of all energy products, including propane, natural gas, electricity and fuel oil as well as increased customer conservation measures; adverse weather conditions; the financial condition of UGI's and AmeriGas' customers; any non-performance by customers of their

contractual obligations; changes in customer, employee or supplier relationships; changes in safety, health, environmental and other regulations; liability for uninsured claims and for claims in excess of insurance coverage; domestic and international political, regulatory and economic conditions in the U.S. and in foreign countries, including the current conflicts in the Middle East; foreign currency exchange rate fluctuations (particularly the euro); the timing of development of Marcellus Shale gas production; the results of any reviews, investigations or other proceedings by government authorities; addressing any reviews, investigations or other proceedings by government authorities or shareholder actions; the performance of AmeriGas; and the interruption, disruption, failure, malfunction or breach of UGI's or AmeriGas' information technology systems, including due to cyber-attack.

These forward-looking statements are also affected by the risk factors, forward-looking statements and challenges and uncertainties described in each of UGI's and AmeriGas' Annual Reports on Form 10-K for the fiscal year ended September 30, 2018, and those set forth from time to time in each entity's filings with the SEC, which are available at www.ugicorp.com and www.amerigas.com, respectively. Except as required by law, UGI and AmeriGas expressly disclaim any intention or obligation to revise or update any forward-looking statements whether as a result of new information, future events or otherwise.

**No Offer or Solicitation**

This press release is for informational purposes only and shall not constitute an offer to sell or the solicitation of an offer to buy any securities pursuant to the proposed transaction or otherwise, nor shall there be any sale of securities in any jurisdiction in which the offer, solicitation or sale would be unlawful prior to the registration or qualification under the securities laws of any such jurisdiction. No offer of securities shall be made except by means of a prospectus meeting the requirements of Section 10 of the Securities Act of 1933, as amended.

**Additional Information and Where You Can Find It**

UGI and AmeriGas will each file with the SEC a Current Report on Form 8-K, which will contain, among other things, a copy of the merger agreement and the support agreement. In connection with the proposed transaction, UGI and AmeriGas, as applicable, will file a registration statement on Form S-4, including a proxy statement/prospectus, and other related documents, including a Schedule 13E-3, with the SEC. This press release is not a substitute for the merger agreement, proxy statement/prospectus, the Schedule 13E-3 or any other document that UGI or AmeriGas may file with the SEC in connection with the transaction. BEFORE MAKING ANY VOTING DECISION OR ELECTION, SECURITY HOLDERS OF AMERIGAS ARE ADVISED TO CAREFULLY READ THE MERGER AGREEMENT, THE PROXY STATEMENT/PROSPECTUS (INCLUDING ALL AMENDMENTS AND SUPPLEMENTS THERETO), THE SCHEDULE 13E-3, AND ANY OTHER DOCUMENTS TO BE FILED WITH THE SEC IN

CONNECTION WITH THE TRANSACTION, WHEN THEY BECOME AVAILABLE BECAUSE THEY WILL CONTAIN IMPORTANT INFORMATION ABOUT THE TRANSACTION, THE PARTIES TO THE TRANSACTION AND THE RISKS ASSOCIATED WITH THE TRANSACTION. A definitive proxy statement/prospectus will be sent to AmeriGas unitholders in connection with the special meeting. Investors and security holders may obtain a free copy of the proxy statement/prospectus (when available), the Schedule 13E-3 (when available) and other relevant documents filed by UGI or AmeriGas with the SEC from the SEC's website at www.sec.gov. Security holders and other interested parties will also be able to obtain, without charge, a copy of the proxy statement/prospectus, the Schedule 13E-3 and other relevant documents (when available) from www.ugicorp.com under the tab "Investor Relations" and then under the heading "SEC Filings."

**Participants in the Solicitation**

UGI, AmeriGas, the General Partner and their respective directors, executive officers and certain other members of management may be deemed to be participants in the solicitation of proxies from their respective security holders with respect to the transaction. Information about these persons is set forth in UGI's proxy statement relating to its 2019 Annual Meeting of Shareholders, which was filed with the SEC on December 20, 2018, and AmeriGas' Annual Report on Form 10-K for the fiscal year ended September 30, 2018, which was filed with the SEC on November 20, 2018, and subsequent statements of changes in beneficial ownership on file with the SEC. Security holders and investors may obtain additional information regarding the interests of such persons, which may be different than those of the respective companies' security holders generally, by reading the joint proxy statement/prospectus and other relevant documents regarding the transaction, which will be filed with the SEC.

33.     The Merger Consideration is inadequate and unfair because, among other things, the intrinsic value of AmeriGas is in excess of the amount its unitholders will receive for agreeing to the formation of the combined business entity.

34.     Furthermore, at the time of the announcement, the price represented a premium of 13.5%; due to the decline in UGI's price, the premium today is 10.3%.

35.     It is therefore imperative that Plaintiff and the AmeriGas' unitholders receive the material information that Defendants have omitted from the Proxy so that he (and they) can meaningfully assess whether the Proposed Transaction is in the best interests of the AmeriGas unitholders prior to the vote.

13

## THE MERGER AGREEMENT AND SUPPORT AGREEMENT

36.     On April,1, 2019 AmeriGas, its General Partner, UGI, and other related parties (identified herein) entered into the Merger Agreement.

37.     Though not described as such in the Merger Agreement, AmeriGas repeatedly represented to Plaintiff in its April 2, 2019 joint press release and elsewhere that as part of the Proposed Transaction, AmeriGas will no longer be a Master Limited Partnership and will instead become a wholly owned subsidiary of UGI.  In conflict with these representations, the Merger Agreement provides in relevant part:

> Upon the terms and subject to the conditions of this Agreement, and in accordance with the DRULPA and the DLLCA, at the Effective Time, Merger Sub shall merge with and into the Partnership (the "Merger"), the separate existence of Merger Sub shall cease and ***the Partnership* [AmeriGas] *shall survive and continue to exist as a Delaware limited partnership*** (the Partnership as the surviving entity in the Merger, sometimes being referred to herein as the "Surviving Entity"). [Emphasis added].

38.     As a separate matter, Section 6.3 of the Merger Agreement provides for a "no solicitation" clause that prevents AmeriGas from soliciting alternative proposals and constrains its ability to negotiate with potential buyers:

> Section 6.3     No Solicitation; Partnership Adverse Recommendation Change
>
> (a)     The Partnership shall, and the General Partner shall use its reasonable best efforts to cause its and the Partnership's and its Subsidiaries' respective directors, officers, employees, investment bankers, financial advisors, attorneys, accountants, agents and other representatives (collectively, "Representatives") to, immediately cease and cause to be terminated any discussions or negotiations with any Person conducted heretofore with respect to an Alternative Proposal, require the return or destruction of all confidential information previously provided to such parties by or on behalf of the Partnership or its Subsidiaries and immediately prohibit any access by any Person (other than Parent and its Representatives) to any physical or electronic data room relating to a possible Alternative Proposal. Except as permitted by this Section 6.3, (x) without the prior written consent of Parent, the Partnership shall not, and shall cause its Subsidiaries not to, and shall use its reasonable best efforts to cause their respective Representatives not to, directly or indirectly (A)

solicit, initiate, knowingly facilitate, knowingly encourage (including by way of furnishing confidential information) or knowingly induce or take any other action intended to lead to any inquiries or any proposals that constitute or could reasonably be expected to lead to an Alternative Proposal, (B) grant any waiver or release of any standstill or similar agreement with respect to any Partnership Interests of the Partnership or of any of its Subsidiaries, (C) except for an Acceptable Confidentiality Agreement permitted pursuant to Section 6.3(b), enter into any confidentiality agreement, merger agreement, letter of intent, agreement in principle, unit purchase agreement, asset purchase agreement or unit exchange agreement, option agreement or other similar agreement relating to an Alternative Proposal, or (D) withdraw, modify or qualify, or propose publicly to withdraw, modify or qualify, in a manner adverse to Parent, the Partnership Board Recommendation or publicly recommend the approval or adoption of, or publicly approve or adopt, or propose to publicly recommend, approve or adopt, any Alternative Proposal, or fail to recommend against acceptance of any tender offer or exchange offer for Common Units within ten Business Days after commencement of such offer, or resolving or agreeing to take any of the foregoing actions, and (y) subject to Section 6.3(b), within five Business Days of receipt of a written request of Parent following the receipt by the Partnership of any Alternative Proposal (but, for the avoidance of doubt, not during any Superior Proposal Notice Period), the Partnership shall publicly reconfirm the Partnership Board Recommendation; provided, that, in the event that Parent requests such public reconfirmation of the Partnership Board Recommendation, then the Partnership may not unreasonably withhold, delay (beyond the five Business Day period) or condition the public reconfirmation of the Partnership Board Recommendation (the taking of any action described in clause (x)(C) or clause (x)(D), the failure to take the action described in clause (y) or the failure to include the Partnership Board Recommendation in the Proxy Statement being referred to as a "Partnership Adverse Recommendation Change"; provided, however, that to the extent any such action was taken solely by Representatives of Parent or by the Partnership at the explicit direction of Representatives of Parent, it will not be deemed a "Partnership Adverse Recommendation Change").

(b)     Notwithstanding anything to the contrary contained in this Agreement, if at any time following the date of this Agreement and prior to obtaining the Partnership Unitholder Approval, (i) the Partnership has received an unsolicited written Alternative Proposal that the Audit Committee believes is bona fide, (ii) the Audit Committee, after consultation with its financial advisors and outside legal counsel, determines in good faith that (A) such Alternative Proposal constitutes or could reasonably be expected to lead to or result in a Superior Proposal and (B) failure to take such action would be inconsistent with its duties under applicable Law, as modified by the Partnership Agreement, and (iii) such Alternative Proposal did not result from a material breach of Section 6.3(a),

then the Partnership may, subject to clauses (x) and (y) below, (A) furnish information, including confidential information, with respect to the Partnership and its Subsidiaries to the Person making such Alternative Proposal and (B) participate in discussions or negotiations regarding such Alternative Proposal; provided, that (x) the Partnership will not, and will use reasonable best efforts to cause its Representatives not to, disclose any non-public information to such Person unless the Partnership has, or first enters into, an Acceptable Confidentiality Agreement with such Person and (y) the Partnership will provide to Parent non-public information about the Partnership or its Subsidiaries that was not previously provided or made available to Parent prior to or substantially concurrently with providing or making available such non-public information to such other Person.

(c)     In addition to the other obligations of the Partnership set forth in this Section 6.3, the Partnership shall promptly advise Parent, orally and in writing, and in no event later than 48 hours after receipt, if any proposal, offer, inquiry or other contact is received by, any information is requested from, or any discussions or negotiations are sought to be initiated or continued with, the Partnership in respect of any Alternative Proposal, and shall, in any such notice to Parent, indicate the identity of the Person making such proposal, offer, inquiry or other contact and the terms and conditions of any proposals or offers or the nature of any inquiries or contacts (and shall include with such notice copies of any written materials received from or on behalf of such Person relating to such proposal, offer, inquiry or request), and thereafter shall promptly keep Parent reasonably informed of all material developments affecting the status and terms of any such proposals, offers, inquiries or requests (and the Partnership shall promptly provide Parent with copies of any additional material written materials received by the Partnership or that the Partnership has delivered to any third party making an Alternative Proposal that relate to such proposals, offers, inquiries or requests) and of the status of any such discussions or negotiations.

(d)     Notwithstanding any other provision of this Agreement, at any time prior to obtaining the Partnership Unitholder Approval, the Audit Committee may effect a Partnership Adverse Recommendation Change in response to an Alternative Proposal or an Intervening Event if the Audit Committee, after consultation with its outside legal counsel and financial advisors, determines in good faith that the failure to take such action would be inconsistent with its duties under applicable Law, as modified by the Partnership Agreement; provided, however, that the Audit Committee may not effect a Partnership Adverse Recommendation Change pursuant to the foregoing unless:

      (i)     if the Audit Committee intends to effect such Partnership Adverse Recommendation Change in response to an Alternative Proposal:

(1) such Alternative Proposal is bona fide, in writing and has not been withdrawn or abandoned;

(2) the Audit Committee has determined, after consultation with its outside legal counsel and financial advisors, that such Alternative Proposal constitutes a Superior Proposal after giving effect to all of the adjustments offered by Parent pursuant to clause (5) below;

(3) the Audit Committee or Partnership has provided prior written notice to Parent in accordance with Section 9.10 (the "Superior Proposal Notice") of the Audit Committee's intention to effect a Partnership Adverse Recommendation Change, and such Superior Proposal Notice has specified the identity of the Person making such Alternative Proposal, the material terms and conditions of such Alternative Proposal, and complete copies of any written proposal or offers (including proposed agreements) received by the Partnership in connection with such Alternative Proposal;

(4) during the period that commences on the date of delivery of the Superior Proposal Notice as determined in accordance with Section 9.10 and ends at 11:59 p.m. Eastern time on the date that is the fifth calendar day following the date of such delivery (the "Superior Proposal Notice Period"), the Audit Committee shall (A) negotiate with Parent in good faith (to the extent Parent seeks to negotiate) to make such adjustments to the terms and conditions of this Agreement as would permit the Audit Committee not to effect a Partnership Adverse Recommendation Change; and (B) keep Parent reasonably informed with respect to the status and changes in the material terms and conditions of such Alternative Proposal or other change in circumstances related thereto; provided, however, that any material revisions to such Alternative Proposal (it being agreed that any change in the purchase price in such Alternative Proposal shall be deemed a material revision) shall require delivery of a subsequent Superior Proposal Notice and a subsequent Superior Proposal Notice Period in respect of such revised Alternative Proposal, except that such subsequent Superior Proposal Notice Period shall expire upon the later of (x) the end of the initial Superior Proposal Notice Period and (y) 11:59 p.m. Eastern time on the date that is the third calendar day following the date of the delivery of such subsequent Superior Proposal Notice; and

(5) the Audit Committee shall have considered all revisions

to the terms of this Agreement irrevocably offered in writing by Parent and, at the end of the Superior Proposal Notice Period, shall have determined in good faith that (A) such Alternative Proposal continues to constitute a Superior Proposal even if such revisions were to be given effect and (B) failure to effect a Partnership Adverse Recommendation Change would be inconsistent with its duties under applicable Law, as modified by the Partnership Agreement, even if such revisions were to be given effect

(ii)    if the Audit Committee intends to effect such Partnership Adverse Recommendation Change in response to an Intervening Event:

(1) the Partnership has provided prior written notice to Parent in accordance with Section 9.10 (the "Partnership Recommendation Change Notice") of the Audit Committee's intention to effect a Partnership Adverse Recommendation Change, and such Partnership Recommendation Change Notice has specified the details of such Intervening Event and the reasons for the Partnership Adverse Recommendation Change;

(2) during the period that commences on the date of delivery of the Partnership Recommendation Change Notice as determined in accordance with Section 9.10 and ends at 11:59 p.m. Eastern time on the date that is the fifth calendar day following the date of such delivery (the "Partnership Recommendation Change Notice Period"), the Partnership shall (A) negotiate with Parent in good faith to make such adjustments to the terms and conditions of this Agreement as would permit the Audit Committee not to effect a Partnership Adverse Recommendation Change; and (B) keep Parent reasonably informed of any change in circumstances related thereto; and

(3) the Audit Committee shall have considered all revisions to the terms of this Agreement irrevocably offered in writing by Parent and, at the end of the Partnership Adverse Recommendation Change Notice Period, shall have determined in good faith that the failure to effect a Partnership Adverse Recommendation Change would be inconsistent with its duties under applicable Law, as modified by the Partnership Agreement, even if such revisions were to be given effect.

(e)    Nothing contained in this Agreement shall prevent the Partnership or the GP Board from issuing a "stop, look and listen"

communication pursuant to Rule 14d-9(f) under the Exchange Act or complying with Rule 14d-9 and Rule 14e-2 under the Exchange Act with respect to an Alternative Proposal if the GP Board determines in good faith (after consultation with outside legal counsel) that its failure to do so would be reasonably likely to constitute a violation of applicable Law; provided, that any Partnership Adverse Recommendation Change may only be made in accordance with Section 6.3(d). For the avoidance of doubt, a public statement that describes the Partnership's receipt of an Alternative Proposal and the operation of this Agreement with respect thereto shall not be deemed a Partnership Adverse Recommendation Change

39.     Section 8.3 of the Merger Agreement requires AmeriGas to pay $20 million as a "termination fee" to UGI in the event this agreement is terminated by AmeriGas.

40.     Also, on April 1, 2019 and concurrent with the Merger Agreement, AmeriGas and the General Partner entered into a Support Agreement.

41.     The concurrently executed Support Agreement under Section 2 provides that the General Partner will vote all of its covered units: (a) In favor of the Proposed Transaction; and (b) Against "any action, agreement, transaction, or proposal that is intended, would reasonably be expected, or the result of which would reasonably be expected, to impede, interfere with, delay, postpone, discourage, frustrate the purposes of, or adversely affect any of the transactions contemplated by the Merger Agreement, including the Merger."

42.     The Support Agreement grants an irrevocable proxy to Defendant Gallagher and Ann Kelly (AmeriGas' Chief Financial Officer as of February 11, 2019) to vote in accordance with Section 2 of the Support Agreement.

43.     The Proposed Transaction is not conditioned on the approval of the holders of a majority of the AmeriGas common units held by unitholders not affiliated with UGI, which owns approximately 26% of the outstanding common units of AmeriGas.

44.     Additionally, the Proposed Transaction was not recommended by an independent

19

special committee appointed by the Board of Directors.  Instead, the Proposed Transaction was recommended by General Partner's Audit Committee and Board, each member of which was appointed by UGI through AGI.

45.     In its Form 10-K filed with the SEC on November 20, 2018, AmeriGas acknowledges and admits that the General Partner (which UGI owns and controls) has conflicts of interest ". . . which may permit our General Partner to favor its own interest to the detriment of holders of Common Units."

46.     Relatedly, the Defendants' Proxy states:

> The GP Audit Committee was not authorized to and did not conduct an auction process or other solicitation of interest from third parties for the acquisition of AmeriGas. Because UGI indirectly controls AmeriGas through its indirect ownership of the General Partner and UGI indicated that it desired to retain its controlling interest in AmeriGas, it was not productive or practical to conduct a meaningful process to solicit interest in the acquisition of assets or control of AmeriGas from third parties.

## THE MATERIALLY INCOMPLETE AND MISLEADING PROXY

47.     On May 6, 2019, in order to convince AmeriGas' public unitholders to vote in favor of the Proposed Transaction, Parent filed a materially incomplete and misleading Proxy with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act.

48.     Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Partnership's unitholders to ensure that it did not contain any material misrepresentations or omissions.

49.     First, the Proxy describes the fairness opinion of AmeriGas' financial advisor, TDH, and the various valuation analyses it performed in support of its opinion.  However, the description of the fairness opinion and analyses fails to include key inputs and assumptions underlying these analyses.  Without this information, the Partnership's unitholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on

the fairness opinion in determining whether to vote their units in favor of the Proposed Transaction. This omitted information, if disclosed, would significantly alter the total mix of information available to the Partnership's common unitholders.

50.     TPH is the financial advisor to APU's special committee. The analyses TDH prepared include: Public Company analysis; Transactions analysis; Discounted Distribution ("DD") analysis; and Levered Distributable Cash Flow ("DCF") analysis.  In each case, the proxy includes projected EBITDA, distributions to unitholders, and distributable cash.

51.     In both the DD and the DCF analyses for APU, TPH uses discount rates of 8-12%, reflective of the company's cost of equity.  The Proxy does not disclose how these discount rates were derived.  In contrast, for the same analyses of UGI, the discount rates applied are 5-6.5%.  The Proxy does not disclose how these discount rates for UGI were derived, nor does it provide specific reasons why the discount rates are different for each company. Of course, higher discount rates result in lower valuations and vice versa, so the TPH analyses make APU appear to have a lower valuation as compared to the same analyses of UGI without disclosing any basis for the materially divergent discount rates.

52.     Also, for the DD and DCF analyses for APU, the date range of the projected distributions, and projected distributable cash flow is April 2019 through September 2022.  The Proxy contains projections for APU including: base case, historical weather case and capital investment case.  TPH uses each of these versions of the projections to arrive at implied value for APU.

53.     TPH also prepared similar analyses to value UGI.  It did not rely on UGI's published projections in the Proxy, but instead purportedly relied upon projections prepared by APU management.  The UGI projections are referred to as the UGI 4+8 case.  The Proxy, however, fails to provide projected dividends, only unlevered cash flow projections for 2019 –

21

2021, as prepared by APU management.

54.     Moreover, TPH prepared a "Levered Discounted Cash Flow Analysis – Dividends" of UGI using "the UGI estimated dividends from April 2019 through September 2021". These are not disclosed in the Proxy.

55.     TPH also prepared an analysis using the "proforma UGI sensitivity 4+8 case." Once again, these projections are not included in the Proxy.

56.     In addition, TPH prepared an "unlevered discounted cash flow analysis" for UGI using the APU projections for UGI that are included in the Proxy.  TPH derived a discount range of 4.50% - 6.0% but does not include any information in the Proxy on how that range was derived.

57.     In order to calculate the terminal value, TPH applied an EBITDA multiple range of 8.5-11.5 x estimated 2022 EBITDA per the UGI 4+8 case and per the UGI 4+8 sensitivity case.

58.     The Proxy does not make clear whether TPH used the UGI management forecasts for 2022 EBITDA, as per UGI 4+8 and sensitivity cases, or the APU projections for UGI. This is misleading and confusing.

59.     If TPH used the APU projections for UGI, then these projections are not included in the Proxy as the APU UGI projections in the Proxy only include unlevered cash flow, not EBITDA.

60.     Furthermore, the Proxy also fails to disclose the supporting information regarding the sensitivity case.

61.     Defendants' failure to include these projections in the Proxy, particularly those projections relied upon by its financial advisor TPH, makes the Proxy materially misleading.

62.     Defendant's failure to disclose the bases for the discount rates, terminal value and EBITDA information makes the Proxy materially misleading.

63.     Such information is material to the Company unitholders, so they can determine whether the Board was fully and adequately informed and, in turn, composed of truly independent individuals who acted in the best interests of the Company and its unitholders or, instead, were conflicted and steered the sales process in a manner that gave priority to their own personal interests.

64.     In sum, the omission of the above-referenced information renders the Proxy materially incomplete and misleading, in contravention of the Exchange Act.  Absent disclosure of the foregoing material information prior to the upcoming unitholder vote, Plaintiff will be unable to make an informed decision regarding whether to vote his units in favor of the Proposed Transaction.

## COUNT I

### (AGAINST ALL DEFENDANTS FOR VIOLATIONS OF SECTION 14(a) OF THE EXCHANGE ACT AND RULE 14a-9 PROMULGATED THEREUNDER

65.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

66.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

67.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that communications with unitholders in a recommendation statement shall not

contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

68.     Defendants have issued the Proxy with the intention of soliciting unitholders' support for the Proposed Transaction.  Each Defendant reviewed and authorized the dissemination of the Proxy, which fails to provide critical information detailed above.

69.     In so doing, Defendants made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading. Each Defendant, by virtue of their roles as officers and/or directors, were aware of the omitted material information but failed to disclose such information, in violation of Section 14(a).  Defendants therefore had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to unitholders although they could have done so without extraordinary effort.

70.     The Proxy is materially misleading and omits material facts that are necessary to render it not misleading. Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Merger.

71.     Defendants knew or should have known that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading. Indeed, Defendants were required to be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

72.     Defendants violated securities laws in preparing and reviewing the Proxy. The

preparation of a registration statement by corporate insiders containing materially false or misleading statements or omitting a material fact violates securities laws.  Defendants chose to omit material information from the Proxy or failed to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the directors of the General Partner of the Partnership.

73.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Partnership's other unitholders, each of whom will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

74.     Plaintiff and the Partnership's other unitholders have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Partnership's other unitholders be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

**COUNT II**
**(AGAINST THE INDIVIDUAL DEFENDANTS FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT)**

75.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

76.     The Individual Defendants acted as controlling persons of the Partnership within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers of the Partnership and/or directors of the General Partner of the Partnership, and participation in and/or awareness of the Partnership's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision

making of the Partnership, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

77.     Each of the Individual Defendants was provided with, or had unlimited access to, copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

78.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Partnership, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein and exercised the same. The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in preparing this document.

79.     In addition, as set forth in the Proxy sets forth at length and described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

80.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

81.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

82.     Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Partnership's other unitholders be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

(A)     declaring that the Proxy is materially false and/or misleading;

(B)     enjoining, preliminarily and permanently, the Proposed Transaction until the Proxy is cured;

(C)     in the event that the transaction is consummated before the entry of this Court's final judgment, rescinding it or awarding Plaintiff rescissory damages;

(D)     directing that Defendants account to Plaintiff for all damages caused by them and account for all profits and any special benefits obtained as a result of their breaches of their fiduciary duties.

(E)     awarding Plaintiff the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiff's attorneys and experts; and

(F)     granting Plaintiff such further relief as the Court deems just and proper.

Dated: July 2, 2019

**DONOVAN LITIGATION GROUP, LLC**

By: *Michael D. Donovan*
      Michael D. Donovan
1885 Swedesford Road
Malvern, PA 19355
Tel: (610) 647-6067
Email: mdonovan@donovanlitigationgroup.com


**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna

Gregory M. Egleston
440 Park Avenue South
New York, NY  10016
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

***Attorneys for Plaintiff***

**MOORE KUEHN, PLLC**
Fletcher Moore, Esq.
30 Wall Street, 8th Floor
New York, NY 10005

***Of Counsel***